IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:12-CV-270-D

| | |
|---|---|
| YVETTE ISKANDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| DEPARTMENT OF THE NAVY, and ) | |
| RAYMOND MABUS, Secretary, ) | |
| ) | |
| Defendants. ) | |

Yvette Iskander ("plaintiff" or "Iskander") is a 61-year old pharmacist who worked for the Department of the Navy from April 2007 until October 2010. Iskander alleges that the Navy discriminated against her based on her sex, race (Egyptian), national origin (Egyptian), and disability (back pain resulting from a 2005 back injury), when the Navy fired her in October 2010. Iskander also alleges that the Navy fostered a hostile work environment based on her national origin and disability. The Navy responds that it did not discriminate against Iskander. Rather, the Navy contends that it fired Iskander for disorderly conduct and battering two co-workers.

Iskander pursued discrimination claims internally via the Navy's EEO process and contested her termination externally via the Merit Systems Protection Board ("MSPB"). The Navy's EEO investigation failed to substantiate Iskander's discrimination claims, and, on November 1, 2012, the MSPB upheld Iskander's termination. See [D.E. 17-1] 3–14; [D.E. 17-9].

On September 18, 2012, Iskander filed suit alleging employment discrimination. See Compl. [D.E. 1]. Iskander seeks relief under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Americans with Disabilities Act, as amended ("ADA"). On December 19, 2012, Iskander filed an amended complaint. See Am. Compl. [D.E. 10]. On December 13, 2014, defendants filed a motion for summary judgment [D.E. 52] and supporting memorandum [D.E. 53].

Iskander responded in opposition [D.E. 60], and defendants replied [D.E. 64]. As explained below, the court grants defendants' motion for summary judgment.

I.

Iskander was born in Cairo, Egypt, in 1954. While in Egypt, Iskander earned an undergraduate pharmacy degree. Iskander arrived in the United States in 1986. Iskander then earned a masters degree in pharmacy at North Dakota State University. Although Iskander then studied for a Ph.D. for six years, she never received a Ph.D.

Iskander is a licensed pharmacist in North Carolina. In 2005, before the Navy hired Iskander, she injured her back in a slip and fall accident while working as a pharmacist at Walgreens. As a result, Iskander received a worker's compensation settlement and still sometimes has back pain. In April 2007, the Navy hired Iskander as a pharmacist and assigned her to work at the naval hospital at Camp Lejeune, North Carolina. Iskander does not recall whether she told the Navy about her 2005 back injury before being hired or beginning employment. See Iskander Dep. [D.E. 53-2] 23–24 (deposition pages 91–96).

As part of Iskander's duties as a pharmacist with the Navy, Iskander verified prescriptions, adjusted medications, monitored prescriptions for drug interactions, and consulted with physicians and patients. Iskander (like the other Navy pharmacists at Camp Lejeune) also worked with numerous pharmacist technicians. The pharmacist technicians principally worked at the pharmacy windows, where they received the prescriptions from the patient, filled the prescriptions, and then brought the prescriptions to the pharmacist for verification. The pharmacists and the pharmacy technicians generally did not sit down while working.

Initially, Lt. Katu was Iskander's supervisor. In April 2007, Iskander told Lt. Katu that she had back pain and would like to use a chair while working. Lt. Katu obtained a wooden chair for Iskander to use. Although Iskander did not believe that the chair was comfortable, Iskander did not complain about the chair and used it while working. See Iskander Dep. 98–108.

2

In March 2008, Dr. Joseph Flott became Iskander's supervisor. See [D.E. 53-4] 110–11 (testimony of Dr. Flott). In March 2009, Iskander told Dr. Flott that her back hurt and requested a chair. Dr. Flott told Iskander to go to the human resources officer. Thereafter, Dr. Flott consulted with the human resources officer and then tasked Lt. Pena with helping to find a comfortable chair for Iskander. Lt. Pena did so, and Iskander received a comfortable chair to use while working. See id. 112–13, 116–17 (testimony of Dr. Flott); 377 (testimony of Lt. Pena).

Throughout Iskander's tenure with the Navy, Iskander had countless conflicts with many of her co-workers and supervisors due, in part, to her confrontational, curt, and brusque manner. See, e.g., id. 128–29, 136–37, 141–45, 152–54, 162–63 (testimony of Dr. Flott); 185–87 (testimony of Lt. Diaz-Sevila); 204–08, 218–19 (testimony of Sonja Webb Carpenter); 241–45 (testimony of James Peterman); 297–304 (testimony of Joann Goforth); 324–35 (testimony of Rosalee Collingsworth); 356–64 (testimony of Heather Edens Thompson); 382–83 (testimony of Lt. Pena). In early December 2009, Dr. Flott learned that Iskander claimed that he refused to provide her a reasonable accommodation concerning her back pain. On December 7, 2009, Dr. Flott instructed Iskander to report to human resources concerning an accommodation. Iskander spoke with Gerri Haga in human resources, and human resources agreed to provide Iskander an ergonomic chair. After the Navy analyzed Iskander's work area and job duties, the Navy provided an ergonomic chair to Iskander.

Iskander's use of a chair caused some tension with some of the pharmacy technicians, who generally stood while working. Moreover, some of the pharmacy technicians would move Iskander's chair out of the way when Iskander was on break because the pods at the pharmacy windows were narrow, the windows were busy with patients, and the chair was in their way. See, e.g., [D.E. 53-4] 118 (testimony of Dr. Flott); 199–200 (testimony of Sonya Webb Carpenter); 270–71 (testimony of Katrina Daniels). A few pharmacy technicians also told one another that they doubted Iskander's alleged back problems and need for a chair.

3

Iskander's confrontational, curt, and brusque manner with co-workers continued to cause her problems in the work place. Iskander also sometimes spoke loudly and disrespectfully to her superiors, including Dr. Flott and Lt. Diaz-Sevilla. See, e.g., 141–46, 162–63 (testimony of Dr. Flott); 186–87 (testimony of Lt. Diaz-Sevilla). Additionally, some co-workers complained to Dr. Flott about the odor of Iskander's lunch meals.

On March 9, 2010, Iskander had a confrontation with pharmacy technician Heather Edens about a prescription refill, and Iskander grabbed Edens's left arm. See, e.g., id. 238–40 (testimony of James Peterman); 356–64 (testimony of Heather Edens Thompson). The Navy then suspended Iskander for five days due to Iskander's inappropriate physical contact of a co-worker.

On March 23, 2010, Iskander filed an internal EEO complaint alleging discrimination based on her race, national origin, sex, disability, and age. See [D.E. 17-2]. Navy EEO personnel began an investigation. See [D.E. 53-4].

On May 14, 2010, Iskander pushed a refrigerator door closed while co-worker Margareta Catacata attempted to place breast milk in the office refrigerator, thereby causing Catacata to spill the milk. See [D.E. 17-4] 1. On May 26, 2010, Iskander snatched a tray from co-worker Dana W. Hill while Hill was trying to count medication. See id. On May 28, 2010, Iskander pulled a chair out from under another co-worker, Jennifer Killebrew, while Killebrew attempted to sit down. Id. On June 4, 2010, Iskander spoke loudly and disrespectfully towards Dr. Flott concerning a work assignment. Id.

On June 18, 2010, the Navy issued Iskander a notice of proposed removal with four specifications of disorderly conduct on May 14, 2010, May 26, 2010, May 28, 2010, and June 4, 2010, and two specifications that Iskander battered co-workers on May 28, 2010, and June 4, 2010. See id. Pending a final determination, the Navy placed Iskander on paid administrative leave. On October 5, 2010, after giving Iskander an opportunity to contest the proposed removal and considering her response, the Navy fired Iskander. See [D.E.17-5].

4

Iskander pursued EEO remedies with the Navy concerning alleged employment discrimination, but Iskander failed to obtain relief in the Navy's EEO process. She then sought relief concerning her termination with the MSPB. On November 1, 2012, the MSPB rejected Iskander's challenge to her termination. See [D.E. 17-1] 3–14; [D.E. 17-9].

II.

In considering defendants' motion for summary judgment, the court views the evidence in the light most favorable to Iskander and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment must initially come forward and demonstrate an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 586–87.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). It is insufficient to show a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

5

Iskander alleges a hostile work environment based on her national origin under Title VII and based on her disability under the ADA.[1] To prove such a claim, Iskander must prove that (1) she experienced unwelcome harassment; (2) the harassment was based on her national origin or disability; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. See, e.g., EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 327 (4th Cir. 2010); Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc); Fox v. Gen. Motors Corp., 247 F.3d 169, 175–76 (4th Cir. 2001).

In order to be actionable, Iskander must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation and quotations omitted). The work environment must be one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). Whether the alleged discriminatory conduct is sufficiently hostile depends on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 787–88 (quotation omitted). Isolated incidents, unless "extremely serious," will not amount to discriminatory changes in the terms and conditions of employment. Id. at 788. Title VII and the ADA do not create a "general civility code" in the workplace. Id. (quotation omitted). Likewise,

---

[1] Oddly, Iskander's complaint and amended complaint do not cite the ADA, and the parties' memoranda do not either. Similarly, the memoranda do not discuss whether Iskander meets the definition of being a "qualified individual with a disability" and thereby falls within the ADA's protected class. Cf. Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 (4th Cir. 2004). The court assumes without deciding that Iskander meets the definition. Nonetheless, the court expects counsel in future ADA cases to address whether a plaintiff is a "qualified individual with a disability" and thereby falls within the ADA's protected class.

6

general complaints of rude or boorish treatment are not sufficient to sustain a hostile work environment claim. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006); cf. Ocheltree, 335 F.3d at 328–30. Title VII and the ADA only proscribe behavior that is "so objectively offensive as to alter the conditions of the victim's employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quotation omitted).

Iskander summarized the evidence in support of her hostile work environment claim in her response to the government's first set of interrogatories and first request for production of documents. See [D.E. 53-8]. Iskander wrote:

> Lt Diaz showed rude and aggressive behavior toward Plaintiff. Dr. Flott falsely accused Plaintiff on several occasions, threatening that "no one wants her". LTCD Hall claimed under oath that "Dr. Flott did continuously attack her character". Plaintiff was the only pharmacist forbidden to use a vacant workstation during her breaks as well as check her e-mail. Susan Brooks, department secretary, and Jennifer Killbrew would even physically push Plaintiff away from the vacant station so she could not use it. Technicians Autumn Brown, Margareta Catacata and Wendie Ogle would purposely verify prescriptions with other pharmacists to cause Plaintiff's verification numbers to decrease. Sonya Carpenter would report Plaintiffs shifts to the supervisor as well as correct other pharmacists medication errors to show as if the only errors were that of Plaintiff. Lt Diaz and Dr. Flott approached several employees (Joann Goforth, Rosalee Collingsworth, Lt Susanne Lemaire and Heather Thompson) asking them to submit complaints against the Plaintiff.

Id. at 7 (response no. 12).

In her deposition, Iskander expounded on the alleged hostile work environment. For example, Iskander complained that sometimes when she took breaks, she would return to find that her chair had been moved from where she had been working. See Iskander Dep. 109, 116. Iskander would then ask one of the pharmacy technicians why she moved the chair, and the pharmacy technician would state that it was in the way. Iskander also testified that Dr. Flott did not allow her to use a vacant work station during her breaks. See id. 120–23. Moreover, Iskander perceived Lt. Diaz-Sevilla, Jennifer Killebrew, and Susan Brock to be rude to her. See id. 119–23. Furthermore,

7

Iskander believed that pharmacy technicians Autumn Brown, Margareta Catacata, and Wendy Oglie would verify prescriptions with other pharmacists so that Iskander's productivity would look worse than Iskander's pharmacist colleagues. See id. 127–29. Iskander also testified that pharmacy technician Sonya Carpenter would report Iskander's mistakes to Dr. Flott, and that pharmacy technicians Rosalee Collingsworth and Joann Goforth were hostile toward Iskander by sometimes leaving the patient window unattended thereby prompting patients to complain about Iskander. See id. 127–33, 147–56.

As further support of Iskander's hostile work environment claim, Iskander cites the testimony of her former co-workers Chanda Miller and Michelle Strickland. See Pl.'s Mem. Opp'n [D.E. 60] 3–5.[2] Miller is a pharmacy technician who testified that she once heard pharmacy technician Heather Edens ask Iskander why she sat on a stool instead of standing up and once heard pharmacy technician Sonya Carpenter ask Iskander in 2009 why she did not quit. Miller Dep. [D.E. 53-3] 5–8 (deposition pages 17–19, 21–22). According to Miller, Carpenter made this comment in response to Iskander's request for help in writing on a comment board that Iskander had trouble reaching. See Miller Dep. 22–26. Miller also testified that she overheard pharmacy technicians Heather Edens, Wendy Ogle, and Autumn Brown complain to one another that Iskander's lunch meals smelled badly. See id. 30–32.

As for Michelle Strickland, Strickland is a pharmacy technician who testified that she overheard pharmacy technicians Heather Edens, Lisa Cox, and Sonya Carpenter opine to one another that Iskander did not need a chair and was faking back pain. See Strickland Dep. [D.E. 53-5] 3–4 (deposition pages 12–14). Strickland also overheard the same three pharmacy technicians and

---

[2] Iskander's six-page memorandum in opposition to the Navy's motion for summary judgment also suggests that the testimony of Debbie Lanier will support her hostile work environment claim, but fails to provide any record citations conforming to Rule 56(c)(1)(A). See Pl's Mem. Opp. 4; Fed. R. Civ. P. 56(c)(1)(A). The court need not search the record to discern whether the record contains admissible testimony from Lanier. See Fed. R. Civ. P. 56(c)(3).

8

another pharmacy technician, Maria Waba, complain about the smell of Iskander's lunch meals. See id. 14–16.

In a perfect world, each workplace would be entirely harmonious and no supervisor or co-worker would ever make an insensitive comment, irritate a colleague, or engage in a petty slight. Congress and the Supreme Court, however, have made clear that Title VII does not require such a utopian workplace in order for an employer to avoid liability for a hostile work environment. See, e.g., Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81. The United States Court of Appeals for the Fourth Circuit repeatedly has made this point as well. See, e.g., Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 207–10 (4th Cir. 2014); Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–24 (4th Cir. 2014); Okoli v. City of Baltimore, 648 F.3d 216, 218–22 (4th Cir. 2011); Hoyle v. Freightliner, LLC, 650 F.3d 321, 331–36 (4th Cir. 2011); Bonds v. Leavitt, 629 F.3d 369, 385–86 (4th Cir. 2011); Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 329–37 (4th Cir. 2010); Fairbrook Med. Clinic, P.A., 609 F.3d at 323–29; Pueschel v. Peters, 577 F.3d 558, 564–66 (4th Cir. 2009); EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 170–78 (4th Cir. 2009); Ziskie, 547 F.3d at 222–29; EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 313–20 (4th Cir. 2008); Baqir, 434 F.3d at 745–47; Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190–91 (4th Cir. 2004); Ocheltree, 335 F.3d at 331–35.

Iskander concedes that Dr. Flott never made any derogatory comments to Iskander concerning her national origin and no witness testified that he ever did. See Iskander Dep. 71–72. Iskander also did not testify that she ever heard Dr. Flott or any of her co-workers make any derogatory comments about her national origin, back pain, or use of a chair. Furthermore, although Chanda Miller heard a few co-workers state to one another that Iskander did not need a chair and that Iskander's lunch meals smelled badly, Miller also testified that she never heard any employee make any comment based on Iskander's race, gender, national origin, or disability. See Miller Dep. 33–34. Moreover, Michelle Strickland testified that she heard Dr. Flott defend Iskander in response to the

9

complaints of some pharmacy technicians by stating that, "It's just a cultural difference." See Strickland Dep. 24-26.

The sporadic petty comments of some pharmacy technicians about Iskander not needing a chair, faking her back pain, and eating malodorous lunches did not create a hostile work environment under Title VII or the ADA. The same conclusion holds true about Iskander's co-workers sometimes moving Iskander's chair out of the way while she was on break. Similarly, Iskander's verbal conflicts with her supervisors about her performance do not rise to the level of a hostile work environment under Title VII or the ADA. Simply put, even viewing the record in the light most favorable to Iskander, no rational jury could find either (1) that Iskander was harassed based on her disability or national origin or (2) that the alleged harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. See, e.g., Pueschel, 577 F.3d at 564-66; Baqir, 434 F.3d at 745-47. Thus, the court grants summary judgment to defendants on Iskander's hostile work environment claim.

Iskander also contends that the Navy terminated her employment due to her sex, race, national origin, and disability. Iskander lacks direct evidence of disparate treatment; therefore, she relies on the burden-shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, Iskander first must prove a prima facie case of illegal discrimination by showing that (1) she is a member of a protected class; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of her discharge; and (4) the discharge arose under circumstances permitting a reasonable inference of illegal discrimination. See, e.g., Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012); Rohan, 375 F.3d at 272 n.9; Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013); Dugan v. Albemarle Cnty. Sch. Bd., 293 F.3d 716, 720 n.1 (4th Cir. 2002); EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 (4th Cir. 2001); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Rocha v. Coastal

10

Case 7:12-cv-00270-D Document 67 Filed 07/07/15 Page 10 of 14

Carolina Neuropsychiatric Crisis Servs., 979 F. Supp. 2d 670, 677 (E.D.N.C. 2013). If Iskander succeeds in proving her prima facie case, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for her termination. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–09 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). Finally, if the defendants carry this burden, Iskander must prove that the reason offered by the defendants was a mere pretext for illegal discrimination. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Burdine, 450 U.S. at 253–56; Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003); Wileman v. Frank, 979 F.2d 30, 33 (4th Cir. 1992).

Assuming without deciding that Iskander met her prima facie case, defendants articulated a legitimate, non-discriminatory reason for her termination. See Hill, 354 F.3d at 286, 298. Specifically, as detailed in the Navy's termination notice and the MSPB decision, Iskander engaged in disorderly conduct on May 14, May 26, May 28, and June 4, 2010, and battered co-workers on May 28 and June 4, 2010. See [D.E. 17-1] 4–14; [D.E. 17-4]; [D.E. 17-5]; [D.E. 17-9]. Thus, the burden shifts to Iskander to provide evidence that creates a genuine issue of material fact concerning whether the Navy's explanation for her termination is a pretext (i.e., a lie) designed to mask intentional discrimination. See, e.g., Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

An employee may establish that the employer's true reason for adverse employment action was discriminatory "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256; see Reeves, 530 U.S. at 143; Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004). Thus, "a key factor for courts to consider [in assessing pretext] is the probative value of the proof that the employer's explanation is false." Holland, 487 F.3d at 215 (quotation omitted). An employer is entitled to summary judgment on the issue of pretext if the

11

employee "create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves, 530 U.S. at 148; see Holland, 487 F.3d at 215. Accordingly, to survive defendants' motion for summary judgment, Iskander must demonstrate that there is a genuine issue of material fact concerning whether the Navy's decision to terminate her employment was a lie designed to mask illegal discrimination. See, e.g., Reeves, 530 U.S. at 148; Holland, 487 F.3d at 215.

Although Iskander believes in her heart that the Navy engaged in illegal employment discrimination in terminating her employment, Iskander has not raised a genuine issue of material fact that the Navy's reason for terminating her employment is a pretext for illegal discrimination. See, e.g., Hux, 451 F.3d at 317–19; Mereish, 359 F.3d at 336–39. Indeed, Iskander does not dispute that she engaged in the misconduct that the Navy described in its termination notice and that the MSPB ultimately found that she committed. See [D.E. 17-1] 4–14; [D.E. 17-9]. Additionally, Iskander cites no evidence that a similarly situated employee outside the protected class engaged in the same misconduct and was not terminated. Furthermore, Iskander's assertion of illegal discrimination does not create a genuine issue of material fact in light of the overwhelming evidence supporting the Navy's legitimate, non-discriminatory reason for terminating her employment. Likewise, Iskander's own view of her employment skills as a pharmacist does not create a genuine issue of material fact concerning pretext. See, e.g., Holland, 487 F.3d at 216–18; King, 328 F.3d at 149; Williams v. Cerberonics, Inc., 871 F.2d 452, 459 (4th Cir. 1989); Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). Similarly, the opinion of Iskander's former co-workers Miller and Strickland that Iskander was a good pharmacist and was never rude to them does not create a genuine issue of material fact concerning pretext. See, e.g., King, 328 F.3d at 149. Accordingly, the court grants summary judgment to defendants concerning Iskander's termination.

Iskander also appears to challenge what she characterizes as unfair discipline that the Navy imposed on her during her employment, including her five-day suspension for battering Heather

12

Edens Thompson in March 2010. See Am. Compl. Exs. A & B. To establish a prima facie case of discriminatory discipline, a plaintiff must show (1) that she is a member of a protected class; (2) that the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measure enforced against her was more severe than those enforced against other similarly situated employees. See, e.g., Taylor v. Va. Union Univ., 193 F.3d 219, 234 (4th Cir. 1999) (en banc), abrogated in part on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003); Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Moore v. City of Charlotte, 754 F.2d 1100, 1105–06 (4th Cir. 1985).

The record contains no evidence that Iskander's supervisor received an allegation against another Navy employee similar to the allegations that Iskander's supervisor received concerning Iskander's battery of Heather Edens Thompson and failed to impose the same discipline on a similarly situated employee. Thus, Iskander has failed to meet her prima facie case and her claim fails. See, e.g., Cook, 988 F.28 at 511; Moore, 754 F.2d at 1105–06; Webb v. N.C. Dep't of Crime Control & Pub. Safety, 658 F. Supp. 2d 700, 710–11 (E.D.N.C. 2009); McDougal-Wilson v. Goodyear Tire &Rubber Co., 427 F. Supp. 2d 595, 610 (E.D.N.C. 2006).

Finally, Iskander complains about numerous other perceived slights that she endured while a Navy employee, including having to work second shift more than some other pharmacists in the summer of 2009 and being the victim of an incompetent EEO investigation and unfair EEO process. See Am. Compl. Exs. A & B. These allegations do not help Iskander because they do not constitute adverse employment action under either Title VII or the ADA, and adverse employment action is necessary to state a claim. See, e.g., James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376–78 (4th Cir. 2004); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543–44 (4th Cir. 2003); Von Gunten v. Maryland, 243 F.3d 858, 867–69 (4th Cir. 2001), abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006); Boone v. Goldin, 178 F.3d 253, 255–57 (4th Cir. 1999). Thus, any claim based on such allegations fails.

13

## III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 52]. The clerk shall close the case.

SO ORDERED. This 7 day of July 2015.

JAMES C. DEVER III
Chief United States District Judge

14

Case 7:12-cv-00270-D   Document 67   Filed 07/07/15   Page 14 of 14